ESTATE of Irvin C. NELSON, Deceased, Florine Nelson, Administratrix, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 15823.

United States Court of Appeals Fifth Circuit.

April 25, 1956.

Alfred P. Marshall, Clearwater, Fla., Marshall & Rives, Clearwater, Fla., for appellant.

Grant W. Wiprud, Atty., Dept. of Justice, Washington, D. C., H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Lee A. Jackson, Harry Baum, Attys., Dept. of Justice, John Potts Barnes, Chief Counsel, Int. Rev. Service, Charles E. Lowery, Sp. Atty., for appellee.

Before HUTCHESON, Chief Judge, and RIVES and BROWN, Circuit Judges.

RIVES, Circuit Judge.

The sole question for review is whether the Tax Court was justified in holding that certain real property included in the Irvin C. Nelson estate upon his death in September, 1950, was entirely homestead under Florida law, in which his widow could acquire only the "terminable interest" excluded from any marital deduction under 26 U.S.C.A. § 812(e) (1) (B) of the 1939 Internal Revenue Code.[1]

The material facts, as stipulated and found by the Tax Court, reveal that Nelson died intestate on September 17, 1950, survived by Florine Nelson, his widow and administratrix of his estate, three children and the son of a deceased child. He and Florine had married in 1915, afterwards living on a 40 acre tract of land in Pinellas County, Florida, belonging to Nelson's mother. This parcel then consisted of a 5 acre tract upon which their residence and a barn was located, and, separated by a grove road or trail, a 35 acre plot which was unimproved, except for about 3 acres planted as a citrus grove.

Shortly after their marriage, Nelson and his wife had entered into a truck farming project, in which they both actively participated. In 1919 Nelson's mother deeded to him the entire 40 acre tract, and in that year the business was expanded to include caretaking of citrus groves for others. In 1924 Nelson purchased an additional 20 acres of unimproved land adjacent to his 40 acre tract, taking title thereto in his own name and making payments on this increment from a bank account over which Florine had no control except in her capacity as his wife and active assistant in the citrus grove business.

Through their joint efforts Nelson and Florine subsequently developed and operated his entire acreage as a citrus grove, except for the 5 acre oak grove contained in the original tract upon which their residence was located. Prior to 1944 there was no formal agreement evidencing Florine's active participation in their joint enterprise, but in that year she and Nelson executed a written partnership agreement under which they continued to operate their citrus project as "Nelson Groves" until Nelson's death in 1950. Partnership income tax returns for their partnership business, as a tax computing entity, were filed, audited and approved by the Commissioner for each of the years covered by the partnership agreement, and in a depreciation schedule of

---

1. "§ 812. Net estate

"For the purpose of the tax the value of the net estate shall be determined, in the case of a citizen or resident of the United States by deducting from the value of the gross estate—

\*   \*   \*   \*   \*   \*   \*

"(e) [as added by § 361 of the Revenue Act of 1948, c. 168, 62 Stat. 110] *Bequests, etc., to surviving spouse*

"(1) *Allowance of marital deduction*

\*   \*   \*   \*   \*   \*   \*

"(B) *Life estate or other terminable interest.*

"Where, upon the lapse of time, upon the occurrence of an event or contingency, or upon the failure of an event or contin- gency to occur, such interest passing to the surviving spouse will terminate or fail, no deduction shall be allowed with respect to such interest—

"(i) if an interest in such property passes or has passed (for less than an adequate and full consideration in money or money's worth) from the decedent to any person other than such surviving spouse (or the estate of such spouse); and

"(ii) if by reason of such passing such person (or his heirs or assigns) may possess or enjoy any part of such property after such termination or failure of the interest so passing to the surviving spouse \* \* \*."

each of the successive returns the 55 acre citrus grove was listed as an asset of the partnership.

On August 5, 1950, about a month before his death, Nelson conveyed both the 55 acre citrus grove parcel and the 5 acre oak grove parcel upon which the residence was located, together with another separate 20 acre parcel not in dispute, to himself and his wife as an estate by the entirety. The motivating consideration for this conveyance was Nelson's apparent desire to insure continued recognition of Florine's status not only as a devoted wife and helpmate, but as a share and share alike business partner as well.

On November 15, 1950, about two months after Nelson's death, all his surviving children quitclaimed any interest they might have had in both tracts to Florine. However, the son of a deceased child, either because of immaturity or for other reasons not disclosed by this record, did not join in the conveyance.

Finding the proof insufficient to show any "full or adequate consideration in money or money's worth" supporting this clearly intended conveyance by all parties directly involved, the Tax Court had no difficulty in barring the widow's marital deduction because of her 812(e) (1) (B) "terminable interest" in the 5 acre oak grove section in which the actual homesite was located, because it considered this tract clearly inalienable homestead under Florida law. And though it conceded the result "more debatable", it also reached a similar conclusion as to the 55 acre citrus grove remaining in dispute, principally in reliance upon the Florida rule permitting aggregation of contiguous tracts within a rural homestead up to the constitutional limitation of 160 acres, regardless of its actual use.[2]

■ Petitioner cites a number of authorities as supporting in principle its contention of prior recognition that such services by Nelson's wife and partner as were here shown are legally sufficient consideration to support his conveyance and divest the homestead,[3] certainly as to the separable 55 acre citrus tract heretofore recognized by the Commissioner as comprising an asset of the partnership and effectively abandoned by Nelson as homestead under Florida law during his lifetime.[4] Finally, petitioner challenges the Commissioner's right to contest the effectiveness of the Nelson conveyance to alienate the homestead under Florida law, especially in the absence of any protesting heirs who alone have capacity in Florida to attack the transfer.[5]

The Commissioner insists that the widow's past services in the care and marketing of the citrus crops grown by the part-

2. Florida Constitution, Article X, §§ 1, 2, F.S.A.; McDougall v. Meginniss, 21 Fla. 362; Armour & Co. v. Hulvey, 73 Fla. 294, 74 So. 212.

3. See e.g. Berkowitz v. Commissioner of Internal Revenue, 3 Cir., 108 F.2d 319, 321; Singer v. Shaughnessy, 2 Cir., 198 F.2d 178, 181; and particularly Hay v. Wanner, 5 Cir., 204 F.2d 355, 358.

4. Presumably, the intention to abandon was shown by the 1944 partnership agreement, the tax returns filed thereunder, his 1950 deed in favor of Florine, and the exclusive devotion of this latter tract to partnership, citrus grove use, since there is admittedly no evidence of any actual physical abandonment of this tract by Nelson prior to his death. Cf. Smith v. Guckenheimer, 42 Fla. 1, 27 So. 900. For other Florida decisions of varying factual applicability, but demonstrating a somewhat analogous "abandonment" of a portion of the homestead because of the separable nature of its use, see e.g., Gulf Refining Co. v. Ankeny, 102 Fla. 151, 135 So. 521, 523; McEwen v. Larson, 136 Fla. 1, 185 So. 866, 868; Cf. Olesky v. Nicholas, Fla., 82 So.2d 510, 512–513.

5. As heretofore noted, the surviving Nelson children, with one minor exception, have already relinquished their rights to the entire homestead by quitclaiming their interests to Florine. The Tax Court, however, was justified in finding that this fact was not binding upon the Commissioner in view of § 812(e) (4) (B) of the Code (1939), providing that disclaimers of interest by third parties conferring upon a surviving spouse an interest to which she was not otherwise entitled shall not be recognized.

nership were presumably gratuitous, since "such services are merely the lot of every rural housewife who aids her husband in the production of family income"; that, in any event, she was further presumably compensated for such services by her share of the partnership profits, without the necessity of the 1950 deed; that this Court's decision in Hay v. Wanner, 204 F.2d 355, as well as other Florida authorities more forcefully in point,[6] show that this is not the type consideration which would be upheld in Florida as sufficient to support the Nelson deed; finally, that, since the application of 812(e) (1) (B) is dependent upon Florida law, the Commissioner of necessity has the right to challenge the adequacy of the consideration thereunder, and under the proof was warranted in denying it recognition vis-a-vis taxation.

■■ With the issues thus framed and considered, we think it appropriate first to reject as insubstantial and unsound the contention that the Commissioner lacks authority to contest the sufficiency of the consideration supporting this transfer under Florida law. Where, as here, the exaction of Federal revenue under a Federal statute is obviously dependent upon the proper application of local substantive law, the Commissioner unquestionably has the right, and even the duty, to seek any adjudication under that law which, in his good faith judgment, he considers essential for the protection of Federal revenue legitimately due, regardless of whether local private parties in interest, such as the Nelson heirs here, have chosen to relinquish their rights to complain. See Helvering v. Stuart, 317 U.S. 154, 161, 63 S.Ct. 140, 87 L.Ed. 154; Bedford v. Commissioner, 5 T.C. 726. In our view, the basic weakness of the Commissioner's position here, at least with respect to the 55 acre citrus grove tract if not as to the 5 acre residential site, results not so much

from a defect in capacity as from a deficiency in proof.

In Hay v. Wanner, supra, the late Judge Strum analyzed for this Court, in his usual careful way, a number of his own State Supreme Court decisions[7] dealing with the consideration there required to effect a divestiture of the homestead. In the course of reconciling the various Florida authorities, he stated:

"In view of the fact that the only specific restriction upon alienation found in Art. 10 is that such property is not alienable without the joint consent of husband and wife, when that relation exists, see Scoville v. Scoville, Fla., 40 So.2d 840, headnote 2, and Denham v. Sexton, Fla., 48 So.2d 416, 418, and in view of the fact that husband and wife may convey to a stranger for an adequate consideration and thus terminate the children's interests, we see no good reason why the wife can not be brought in with the husband as a tenant by the entireties in the homestead property when she pays therefor *an adequate consideration from her separate estate*, and the transaction is in all other respects bona fide and not merely an artifice to defeat the children. We know of no Florida case which condemns such a conveyance." Hay v. Wanner, 204 F.2d at page 358.

■ True, there was no showing here that, at the time of the execution of the deed, the widow contributed any consideration from her own separate estate, or even that she ever had a separate estate, as such, other than her acknowledged right to share and share alike as an equal partner with Nelson at least from the date of their partnership agreement in 1944. As to the 55 acre citrus grove, however, the deed simply fur-

6. Citing, inter alia, Thomas v. Craft, 55 Fla. 842, 46 So. 594; Byrd v. Byrd, 73 Fla. 322, 74 So. 313; Norton v. Baya, 88 Fla. 1, 102 So. 361; Croker v. Croker, D.C.S.D.Fla., 7 F.2d 218.

7. This Court judicially knows that Judge Strum also served with distinction upon the Florida Supreme Court prior to his appointment to the Federal bench.

nished further evidence to sustain the existing status shown by the 1944 partnership agreement and the partnership income tax returns, that that grove was devoted entirely to the partnership business, and that it was entirely appropriate that title to the grove be held by the partners as an estate by the entirety. The deed was the fruition of the plan by which husband and wife had conducted their lives for years and upon the faith of which, certainly in part, the wife had rendered unusually valuable services to the partnership.[8] In the con-

8. We rely upon the strong showing throughout this record of Florine's valuable services to the grove partnership, above and beyond her presumably gratuitous wifely duties in the home, as demonstrated by the following excerpts of testimony:

"Q. What business was Mrs. Nelson engaged in? A. Well, Mrs. Nelson used to come to my place of business and bring in work, and deliver work out to the men as they were working in the groves. General, I might say, a sort of a supervision. She took care of some of the books, sent out bills.

"Q. Were they in business on an individual basis, each of them, or in the form of a partnership? A. No, I assumed that it was a partnership.

"Q. Mr. Biggins, you have testified on direct examination that you saw Mrs. Nelson sending out bills, or that you knew that she did send out bills? A. That is right.

"Q. That she did bookkeeping work? A. That is right.

"Q. That she did supervisory work? A. That is right.

"Q. That she did a great deal of work in the partnership? A. That is right.

"Q. How do you know these things, Mr. Biggins? A. How do I know them?

"Q. Yes, sir. A. I happened to have some of the bills come to me, and I happened to be on the grove when she delivered—

"Q. You have actually seen her do these things? A. Absolutely I have, yes, sir.

"Q. What did Mrs. Nelson do in the way of services or duties in behalf of this partnership? A. She was the office—she was the only person in the office during the day when Mr. Nelson was out. She took orders, and delivered them to Mr. Nelson or the crews. If you had an order, that you wanted to order fertilizer, or if you wanted a crew in any grove anywhere, or wanted fertilizer, or wanted Mr. Nelson to look the grove over for certain things that you might want information on, she would deliver the messages; and to my intimate knowledge she also kept the books."

"Q. Mr. Palmer, you have testified on direct examination that you have seen Mrs. Nelson, or that you know she rendered various services to the partnership in question. A. That is right.

"Q. Have you actually seen her render these services? A. Yes.

"Q. Have you seen her deliver these messages? A. Yes.

"Q. Now when she delivered these messages was she acting actually in more of a wifely status, or was she actually a business part, an integral part of this partnership? A. She acted daily in the capacity of a business partner.

"Q. Of a business partner? A. In receiving telephone calls, orders, delivering messages daily.

"Q. And Mr. Nelson then, of course, took care of part of the supervisory work, did he? A. That is right.

"Q. And she did the office work? A. Yes.

"Q. Was the office in the home? A. It was.

*  *  *  *  *  *  *

"Q. But your understanding is that there was only one 'phone, and that was the home 'phone as well as the business telephone? A. I would say that.

"Q. When you say 'we put in a truck farm,' whom do you refer to? A. Mr. Nelson and myself.

"Q. What did you do, if anything, in reference to that truck farm? A. Well, we would go down there in the morning, and my mother would take care of the baby and I would help him down in the garden all day.

"Q. Was that at that time a joint undertaking between the two of you? A. Yes, sir, it was.

*  *  *  *  *  *  *

"Q. What did you do specifically? A. Well, I stocked everything, and I have taken tires to him, I have taken equipment to fix tires, and I have taken chains to pull him out of the mud if they had gotten stuck, I have taken gasoline to them, and anything that it happened that he wanted at home he would call me and I would take it to him. And of course I was at home, I answered the 'phone and took down people's names that wanted work done, and things like that.

"Q. Did you and your husband, from the beginning, have any verbal or written agreement between you? A. We had

ceded absence of any authoritative determination by the Florida Supreme Court expressly invalidating a homestead conveyance in favor of the widow or heirs for inadequacy of past services as consideration, we construe Hay v. Wanner, supra, and the other Florida authorities as requiring only that the consideration to support such conveyance must not be gratuitous and that, in a case such as this, adequate consideration in other forms than from the wife's separate estate may exist. We interpret the Florida constitutional provision and authorities approving aggregation of separate, rural homestead parcels up to the 160 acre limitation as purely permissive, rather than mandatory, and certainly there is no language in any of the authorities cited which *requires* denial of tax recognition to a conveyance otherwise valid and unattacked by those with status to complain under Florida law.

■ In sum, while we agree in part with the Tax Court and the Commissioner that the Nelson conveyance was ineffective under Florida law to divest the homestead character of the 5 acre residential site, both because of its purely homestead use and the valid presumption that Florine's services there, as a wife rather than as a grove partner, were presumably gratuitous, we reject as unwarranted under this proof the similar conclusion as to the severable 55 acre citrus grove tract [9] which was admittedly a principal asset of the partnership dur-

ing Nelson's life and previously recognized by the Commissioner as such.[10]

It follows that the decision of the Tax Court should be, and it is hereby

Affirmed in part and reversed in part.

---

a verbal agreement, no written one.

"Q. What was the nature of this agreement? A. Well, it was a fifty-fifty proposition.

"Q. You would divide the earnings of the partnership fifty-fifty? A. Absolutely, and we did that until the end, until he died."

9. In this connection, probably it should be noted that the Tax Court found the "grove road" or "trail" separating the 5 acre homesite from the 55 acre citrus area insufficient to justify severability of the aggregate homestead arising from "the contiguity of the properties",—a subsidiary finding which we also reject as insupportable under this record because it ignores the uncontradicted proof of Nel-

son's intention to abandon the citrus area as homestead from its exclusive devotion to commercial use, and particularly from his relinquishment of this tract as such under both his 1944 partnership agreement and the 1950 deed to Florine.

10. Of course, the Commissioner is not now equitably estopped to assert the homestead character of the entire tract merely because of his prior acceptance and approval of the partnership tax returns depreciating the grove as a partnership asset, but his prior treatment of this tract does seem to us an evidentiary circumstance inconsistent with his present contention that this same tract is not entitled to separate treatment from the 5 acre homestead proper.